## THOMPSON v. HAWES et al.

### HAWES v. THOMPSON.—162 S. W. (2d), 71.

Western Section.  February 21, 1941.

Petition for Certiorari denied by Supreme Court, June 28, 1941.

582

Canada & Russell and Cooper Turner, Jr., all of Memphis, for Guy A. Thompson, trustee.

Exby, Moriarty & Pierce, L. W. Harrison, and Wils Davis, all of Memphis, for Emma Hawes and Floyd M. Hawes.

ANDERSON, J. The original plaintiffs, Floyd M. Hawes, his wife, Mrs. Emma Hawes, and their three children, all sustained personal injuries when the automobile in which they were riding ran into the side of a railway engine that was pulling a train across a grade crossing in Arkansas. The automobile was demolished or severely damaged. It was being operated at the time by Floyd M. Hawes, and the others were his guests. Each instituted a separate action against the defendant who is the Trustee in Bankruptcy of the railroad company. The actions of the wife and children were for damages for personal

injuries. In his action the husband sought to recover for loss of services of the wife and children, expenses and also for personal injuries sustained by him. The cases were tried together with the result that there was a verdict in favor of each of the plaintiffs. In the cases of Mrs. Hawes and the children the defendant's motions for new trials were overruled and he appealed in error. Upon consideration of the motion in the case of Floyd M. Hawes the judge granted the defendant's motion for a directed verdict which, upon the trial, he had overruled, and dismissed that suit. Thereupon that plaintiff filed a motion for a new trial which was submitted to the judge and by him taken under advisement. Later his attention was directed to the fact that this motion had not been submitted until after the time limit within which such motions were to be filed and submitted as fixed by the rules of the Court, and he accordingly sustained a motion by the defendant to strike the plaintiff's motion for a new trial on the ground, so it is claimed, that he had lost jurisdiction of the matter by reason of the failure to comply with that rule. Thereupon the plaintiff, Floyd M. Hawes, appealed from the judgment dismissing his suit and has assigned as error the action of the trial judge in declining to consider his motion for a new trial on the merits.

We will first dispose of the questions presented upon the defendant's appeal in error.

The accident occurred about 3:15 P. M. on June 17, 1938. The railroad runs approximately east and west in that vicinity and crosses at right angles the highway on which the automobile was traveling in a southerly direction. As he neared the crossing the driver of the car observed the train, consisting of an engine and several passenger cars, approaching from the east. He undertook to stop the automobile by applying the brakes but was unsuccessful. The car struck the side of the engine very near the front and was thrown against a nearby post. The vehicle was damaged and all of the occupants were injured to some extent. Only Mr. and Mrs. Hawes, however, had any major injuries.

The common law counts of the declaration charged that the train was being operated at a reckless and excessive rate of speed; that no proper lookout was being maintained and no warning signal was given of the train's approach. It was also charged that the defendant had negligently allowed the view in the vicinity of the crossing to become obstructed by weeds, shrubs and trees to the extent that one approaching that point "could not see a train which was being operated west on said track."

In other counts the plaintiffs plead a violation of the statutes set out in Crawford & Moses Code of the laws of the State of Arkansas, Section 8568a, requiring the ringing of a bell or sounding of a whistle upon the approach of a train to a grade crossing; Section 8562, providing in substance that all railroads in Arkansas should be responsible

for all damage to persons or property done or caused by the running of trains in that state; and Section 8568, defining the duty of trainmen to keep a lookout ahead and placing the burden of proof on the railroad to prove that such a lookout was kept where it appears that by the performance of that duty the peril of the person injured could have been discovered in time to have prevented the injury by the exercise of reasonable care after the discovery of such peril.

The plaintiffs also plead and relied upon Section 8575 of the same Code of laws referred to in the briefs as the comparative negligence statute and reading as follows:

"In all suits against railroads, for personal injury or death, caused by the running of trains in this State, contributory negligence shall not prevent a recovery where the negligence of the person so injured or killed is of less degree than the negligence of the officers, agents or employees of the railroad causing the damage complained of; provided, that where such contributory negligence is shown on the part of the person injured or killed, the amount of recovery shall be diminished in proportion to such contributory negligence."

The only contention made by the defendant is that regardless of all other questions the undisputed evidence, viewed in the light most favorable to the plaintiff, leaves no reasonable doubt about the proposition that the sole proximate cause of the plaintiffs' injuries was the negligence of the driver of the car in failing to bring it to a stop in time to avoid striking the engine, and hence that his motion for a directed verdict should have been sustained.

Disregarding the defendant's evidence, and giving the plaintiffs the edge in our consideration, it might reasonably have been found that these were the pertinent facts: Hawes and his family were enroute from Malden, Missouri, to Memphis, Tennessee, on Highway 61 in a 1936 model Ford automobile. The driver had made the same trip before. The weather was clear and warm and when they approached the railroad crossing all of the windows of the car were down. In that vicinity the highway is straight and level for a distance of a mile or more. East of the highway and north of the railroad in the vicinity of the crossing there is a large tract of timber of several hundred feet. The southern edge of this growth is about 400 feet from the center of the railroad. Adjacent to the timber is a cotton field 250 to 400 feet across and south of the cotton field is a canal or drainage ditch which is immediately adjacent to the railroad right-of-way. The canal runs parallel with the railroad tracks and at the time of the accident its banks were covered with a heavy underbrush and small trees. There is evidence that this growth was between 50 and 75 feet from the center of the railroad and as near to the highway in some places as 60 feet. The railroad tracks in the vicinity are also straight and level for several miles.

The automobile had been purchased secondhand by Mr. Hawes and had been driven for about 6,000 miles. The brakes were in good

condition. As he neared the bridge over the drainage canal, Hawes was driving, according to his testimony, at a rate of speed of between 40 and 45 miles an hour. Before he got on the bridge, the north end of which was shown by the plaintiffs to be approximately 130 feet north of the north rail of the railroad track, the driver saw the train approaching from the east at about 65 miles an hour.

According to Hawes, when he first saw the train it was about the same distance from the crossing that the car then was. The probabilities are that it was somewhat further, but the discrepancy, if it be so regarded, is not determinative.

Hawes testified that as he approached the bridge his daughter exclaimed, ''Oh, there is a train,'' whereupon, according to his testimony, ''I said I had seen it.'' He was then asked, ''And what did you say to your wife?'' to which he responded, ''I started to put on my brakes, and I said 'Must I try to beat it?' She said, ''Oh Lord, No' and she reached down and grabbed the emergency;'' and that at that time he was putting on the foot brake.

At another point he testified that he put on the brakes ''gradually at first'' and when his wife ''grabbed the emergency I put everything I had into it then'' referring to the application of the brakes; and that at the same time he pushed in the clutch pedal so as to release the clutch. He said that ''that is something I always have done,'' referring to releasing the clutch simultaneously with applying the brakes; that ''I guess it is a habit I shouldn't have but I always have done it.''

The plaintiffs introduced Lieutenant Jim Galloway of the traffic department of the Memphis Police Force, who fully qualified as an expert on the question of the distance within which automobiles may be stopped by application of the brakes. He testified without objection, that, given the same road conditions, an automobile such as that being operated by Mr. Hawes, when running at 50 miles an hour, could be stopped within 125 feet; at 45 miles an hour, within 101 feet; and at 40 miles an hour, within 80 feet. He also testifid that when the clutch is disengaged an application of the brakes will not stop the car as quickly as otherwise but that the difference is very slight.

The defendant introduced one Ticer who did not claim to be an expert but who testified that he had taken a similar automobile with similar brakes and similar tires under the same weather conditions and made an experiment at the same place, with respect to how quickly a car could be stopped, and found that at 40 miles an hour he could stop in 44 feet, 7 inches; at 50 miles an hour, in 70 feet, 10 inches. He did not make an experiment at 45 miles an hour.

This was all of the evidence on that point and for the purpose of disposing of the question before us we accept, as we are bound to do, the testimony of Lieutenant Galloway.

There was also evidence to the effect that there were traffic signals located at the crossing that were designed to give warning of the approach of trains by flashing a light and that these signals were not working, that is, that no light flashed a warning of the approach of the train here in question.

It seems to be first contended by the plaintiffs that the driver of the car was himself guilty of no negligence that contributed proximately to the injuries.

Thus, it is said in the brief:

"Hawes was working under a difficult set up. When this train loomed up on the horizon at his very front fender he was debating as to whether he could stop or whether he should try to give his automobile more gas and get across in front of it. This is a normal reaction and one for which he cannot be censured. When one acts in an emergency he is not held to the best and highest degree of judgment. But the fact that he is confronted with a situation that startles and confuses him, mitigates any error in judgment."

Considered in the light of the facts just stated, we regard this as practically a concession of gross negligence on the part of the driver of the car. It may be true that because of some peculiarities personal to him he was so confused as to not know what to do but we think the situation would have presented no emergency to an ordinarily prudent person. The fact that there was no doubt in Mrs. Hawes' mind about what to do rather fortifies this view. When she learned of her husband's indecision she, without hesitation, reached for the emergency brake for the purpose of applying it. However, in a case of this kind, where, as here, the party sought to be held liable is not shown to have been aware that the other party was laboring under a handicapping peculiarity of a pertinent nature, if that were the fact, in determining what was required the question is not how the particular individual reacted but rather what that mythical person whom the law knows as "an ordinarily prudent person" would have done under the same circumstances. Hicks v. Herbert, 173 Tenn., 1, 113 S. W. (2d), 1197; 20 R. C. L., 115, 116.

Moreover, if by any stretch of the facts it could be said that the driver was confronted with an emergency then it would have to be said also that it was of his own making in not having his car under control as he approached the crossing which in itself was an admonition of danger. So it is obvious, we think, that the driver's negligence was a proximate cause of the injuries.

But in the cases we are now considering the plaintiffs were guests of the driver and hence not chargeable with his negligence. Knoxville Railway & Light Co. v. Vangilder, 132 Tenn., 487, 492, 178 S. W., 1117, L. R. A., 1916A, 1111. So we must still determine whether there was a room to hold that the assumed negligence of defendant's servants was a proximate cause of the plaintiffs' injuries, either

operating alone or concurrently with the negligence of the driver to produce that result. Stated somewhat differently, must it be held as a matter of law that the negligence of the driver was the sole proximate cause of the injuries to his guests? If so, the recovery was not warranted.

This is true under the Arkansas statutes relied on by the plaintiffs no less than under the common law; for the cases construing those enactments hold that before there can be liability thereunder it must be made to appear not only that the carrier was guilty of negligence but that such dereliction of duty contributed as a proximate cause to the injury or damage sustained. Tinsley v. Missouri Pacific R. Co., 189 Ark., 530, 73 S. W. (2d), 473; Chicago, R. I. & P. R. Co. v. Sullivan, 193 Ark., 491, 101 S. W. (2d), 175; also: Missouri Pacific R. Co. v. Price, 182 Ark., 801, 33 S. W. (2d), 366; St. Louis & San Francisco R. Co. v. Ferrell, 84 Ark., 270, 105 S. W., 263, and Missouri Pacific R. Co. v. Moore, 199 Ark., 1035, 138 S. W. (2d), 384.

Our inquiry is therefore considerably narrowed.

The "proximate cause" of an injury may, in general, be stated to be that act or omission which immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another, out which the injury would not have been inflicted. Nashville v. Singer & Johnson Fertilizer Co., 127 Tenn., 107, 153 S. W., 838.

What is meant by "proximate cause" is not necessarily that which is next or last in time or place, but that which is a procuring, efficient, and predominant cause. Closeness in casual relation, rather, is the meaning. Grigsby & Co. v. Bratton, 128 Tenn., 597, 163 S. W., 804.

Considering the facts as stated in the light of these definitions we see no escape from the conclusion that the sole, proximate cause of the plaintiffs' injuries was the gross negligence of the driver of the car. We regard as immaterial the question of whether any lookout was kept or whether any warning was given of the train's approach either by the trainmen or by the automatic signalling devices; for such a warning could have added nothing to what the driver of the car already knew or would have known if he had exercised ordinary care. Tinsley v. Missouri Pacific R. Co., supra; Chicago, R. I. & P. R. Co. v. Sullivan, supra.

Thus it is manifest that after he saw the train the driver had at the very least a distance of 130 feet and probably a little more within which to bring the car to a stop. All he had to do was to apply the brakes when he saw the train, instead of debating whether he should try to cross or not, as clearly he was doing, and the car would have been brought to a stop in time to avoid the accident and resulting injuries. The very circumstances, apart from the testimony of the defendant's expert, tend to show that this is true. We mean the fact that he lacked just a fraction of succeeding in bringing the car to stop before it struck the engine.

Moreover if, after he actually saw the train approaching, the driver was in doubt as to whether to try to stop, it is not reasonable to believe that any earlier warning by signal or otherwise would have had the desired effect.

So it is clear that between the alleged negligence of the defendant's servants that we have assumed existed, there intervened the gross negligence of the driver of the car which we are compelled to conclude was the "procuring, efficient, and predominant cause" of plaintiffs' injuries.

We say this because it seems too clear for argument that his failure to stop the car in time was in no sense attributable to any of the acts or omissions of defendant that are relied on, for, as stated, if the actual sight of the approaching train left him in doubt as to the advisability of stopping instead of going ahead, it is not reasonable to suppose that any previously given warning would have made the required impression on him, or that if he had heard it sooner he would have acted any differently.

It is proper to say just here that plaintiffs have briefed the cases on the assumption that there was evidence that the car was travelling at 50 miles an hour when the driver first observed the approaching train. This position is evidently bottomed on the testimony of the driver's daughter, for the driver himself testified that at that time the speed was between 40 and 45 miles an hour.

The daughter's testimony does not rise to the dignity of evidence. She said she had not looked at the speedometer and she showed no qualifications to judge the speed of the car. In fact, she expressly said that her conclusion in regard to the rate of speed was based on what she knew about the speed at which her father usually drove rather than her observation with respect to that matter on the particular occasion under investigation. Her testimony then upon that point was, we think, too thin to be the turning point of a judicial decision reaching into the defendant's pocketbook and transferring a portion of the contents to the plaintiffs. No reasonable mind would accept it as adequate support for a conclusion of fact. See Consolidated Edison Co. v. National Labor Relations Board, 305 U. S., 197, 59 S. Ct., 206, 83 L. Ed., 126; National Labor Relations Board v. Columbia Enameling, etc., Co., 306 U. S., 292, 59 S. Ct., 501, 83 L. Ed., 660.

However, the result would be the same if the rate of speed be taken at 50 miles an hour because even then from the testimony of the plaintiff's own witness, the only conclusion reasonably possible was that prompt action on the part of an ordinarily prudent person would have stopped the car in time to have avoided the accident.

The general conclusion we have reached upon this phase of the case is supported in principle by the Arkansas cases. Thus in Tinsley v. Missouri Pacific R. Co., supra, the plaintiffs, one of whom was a passenger, were occupants of an automobile that ran into a moving

passenger train at a grade crossing in the city of Paragould. They contended that the train was being operated at a rate of speed in excess of that provided by a city ordinance; that the statutory signals were not given as the train approached the crossing; and that the train was moving at a high and excessive rate of speed. The accident happened on a dark, rainy night and the evidence showed that when the car reached a point where the view to the south was unobstructed the plaintiff saw the headlight of a locomotive within a distance of 500 to 789 feet of the crossing and that the car at that time was traveling 15 to 20 miles an hour and continued at that rate of speed until within about 24 feet of the tracks, when, upon seeing the locomotive suddenly ''loom'' in front of them, the driver applied his brakes and was unable to check the car so as to prevent its striking the train. It was held that under these facts it was immaterial whether any signals were given or at what rate of speed the train was moving; that the only cause of the collision was the negligence of the plaintiffs. Chicago, R. I. & P. R. Co. v. Sullivan, supra, was a somewhat similar case, wherein a like result was reached.

In the case of Missouri Pacific R. Co. v. Moore, 199 Ark., 1035, 138 S. W. (2d), 384, it was held that where an automobile in which the plaintiff was riding as a passenger had defective brakes and the driver, traveling fifteen miles per hour, saw a train when at least 50 feet from a crossing which the car was approaching, the absence of proper brakes on the automobile was the proximate cause of the collision between it and the train at the crossing and that it was immaterial whether the statute requiring signals to be given by trains to warn travelers on the highway of their approach was complied with, since the driver had such knowledge without the signals in ample time to have stopped the car had his brakes been in good condition.

That, we think, is precisely the situation in these cases. Under the undisputed evidence the driver had ample time to have stopped the car if his brakes were good, as he testified, and he had exercised ordinary care in using them. The conclusion is therefore inescapable that the sole cause of the injuries was either that he did not have adequate brakes or if he did, he failed to make the use of them that ordinary care required.

The plaintiffs also rely strongly upon the case of Hines v. Betts, 146 Ark., 555, 226 S. W., 165. We fail to see how that decision has any application to the determinative question here. It holds no more than that the rule that the failure of a person, when about to cross a railroad track at a public crossing, to stop, look and listen for approaching trains, constitutes contributory negligence barring a recovery, is not in Arkansas a hard and fast rule making it obligatory upon the court under any and all circumstances to take the question of contributory negligence from the jury. It was accordingly held that where a pedestrian struck by a train was shown to have been

approaching a railroad crossing in the nighttime while it was snowing, with the view of the tracks blocked by a string of cars on a side track, the question of contributory negligence was one for the jury notwithstanding that it was conceded that he saw the light of the train and knew of its approach.

The theory of that decision was "the jury might have inferred that Betts, as he looked toward the north, saw the headlight of the approaching train, and on account of the snow thought it was approaching at its usual rate of speed and that he would have plenty of time to cross the track ahead of the train as did the man just in front of him." It is too clear for argument that we have no such situation in the present case. Here the evidence leaves no doubt that the operator of the car not only saw the train but was fully aware of the rate of speed at which it was approaching.

But apart from this consideration the rule announced in that case and others cited by the plaintiffs with respect to the circumstances under which contributory negligence in a case based on a railroad crossing accident is a question for the jury, can, as we have said, have no application where the negligence of the defendant cannot be regarded as a proximate cause of the injury or damage complained of; and that, we repeat, is the situation we have in this case. Those decisions are just not in point. None of them even purport to deal with the only question presented by the defendant in the present case.

The result is that the judgments in favor of Mrs. Emma Hawes and her children are reversed and their suits will be dismissed.

■■ This brings us to the question presented by the appeal in error of the plaintiff, Floyd M. Hawes.

The facts necessary to dispose of the question raised by him are these:

After the return of the verdict in favor of Hawes the defendant seasonably filed his motion for a new trial on May 21, 1940, which, as already stated, was granted and the suit dismissed as upon the granting of a directed verdict. Thereafter, on May 31, 1940, the plaintiff filed a motion for a new trial. Rule 12 of the trial court provides: "All motions for new trial shall be in writing and shall be entered upon the motion docket and filed with the clerk not later than the Wednesday preceding the Friday on which it will be called and all such motions shall be filed and submitted to the court within fifteen days after the rendition of the judgment in the case provided that the Judge for good cause shown, may extend said time as allowed by law."

On June 7, 1940, two days after the fifteen days contemplated by the above rule had expired, an order was entered reciting that the motion for a new trial "was this day submitted to the Court." On July 5, 1940, it seems that there was presented to the Court a motion by the defendant to strike the plaintiff's motion for a new trial on

the ground that it was not submitted within the time provided by the rules of the Court.

On July 17, 1940, an order was entered nunc pro tunc July 9, 1940, sustaining the defendant's motion to strike, the order reciting "that although said motion for a new trial was marked submitted to the court on June 7, 1940, such submission was not within the fifteen-day period allowed by the rules of this court and particularly Rule 12 thereof, and was without notice to or consent of counsel for the defendant, and that the court would not have allowed the motion to be submitted had his attention been called to the fact that the fifteen-day period had expired, and that no good cause has been shown why the rules of the court should be set aside, and that the action of the court in marking said motion submitted was a nullity, and the court is therefore of the opinion that the defendant's motion to strike the plaintiff's motion for a new trial should be granted."

It was then further recited that this action was taken on July 9, 1940, "at which time counsel for the parties were so advised and directed to prepare a formal order in accordance herewith" and it was accordingly "ordered, adjudged and decreed nunc pro tunc July 9, 1940," that the defendant's motion be sustained and the plaintiff's motion for a new trial stricken.

Thereafter, just when does not appear, the plaintiff filed an unverified petition praying "that this honorable Court relax said rule and now permit the submission of his motion for a new trial of this cause so that justice may be done to the end that this plaintiff may have a review of this cause."

After setting out the proceedings, it was averred in the petition that the member of plaintiff's counsel who had handled the trial was absent from the city engaged in another Court and on that account had been unable to have the motion for a new trial submitted within the time fixed by the rules but had appeared in Court promptly upon his return to Memphis on the regular motion day and submitted same on June 7, 1940. This petition was overruled and disallowed by an order entered July 17, 1940.

In this order it was recited:

"The Court is of opinion that plaintiff's petition for the relaxation of the rule, so as to permit action on his motion for new trial should be overruled and denied, the Court being of the opinion that the Court is without authority to extend the time for submitting motions for new trial after the 15 day period had expired, and that the application for extension of time must necessarily come within the 15 days or the Court loses jurisdiction of said cause, and because the Court had already granted Defendant's motion to strike Plaintiff's motion for new trial."

The contention is that the Court erred in finding and holding that it was without jurisdiction and had no authority to extend the time

for submitting plaintiff's motion for a new trial because it was not submitted within 15 days as required by Rule 12 of the circuit court.

The Chancery Court for Shelby county has a similar rule which we construed in the case of Heineman v. Netherlands Insurance Co., 10 Tenn. App., 490. The opinion was prepared by the late Judge Heiskell, a former Chancellor in that jurisdiction. We held the rule to be a reasonable one and hence valid and that it was not error to refuse to consider a motion for a new trial which, although filed in time, had not been submitted for consideration within the period contemplated by the rule.

However, we think the judge in the instant case was in error insofar as he based his declination to consider the motion on the asserted view that he had no jurisdiction to do so because the motion, though filed in time, had been submitted after the expiration of the fifteen-day period. His jurisdiction continued until the judgment became final. Apart from the effect of the rule in question, the seasonable filing of the motion and the entry on the minutes to that effect, operated to suspend the judgment and prevent it from becoming final pending the disposition of the motion. Feldman v. Clark, 153 Tenn., 373, 284 S. W., 353; Life & Cas. Ins. Co. v. Baber, 166 Tenn., 10, 57 S. W. (2d), 791. As we have held, the time within which a motion must be filed or may be submitted after it is filed can be abridged by a reasonable rule of the Court, but such a rule, as are all others, is adopted for the purpose of facilitating and expediting the business of the Court and is primarily for the benefit and convenience of the Court in the performance of its duties and not necessarily to serve the convenience and purposes of litigants. Such rules may be inflexibly adhered to or relaxed according to the sound discretion of the judge founded in the circumstances of each case so as to attain and not defeat the end of their adoption. Cozart v. Lisle, Meigs, 65; Hilton v. Johnson City General Hospital, 160 Tenn., 535, 26 S. W. (2d), 626.

In the case last cited the Supreme Court quoted with approval what this Court had said in that case with respect to the enforcement of one of its rules. It was this: "As to the power a court may have to disregard salutary rules with reference to rehearing, while it may remain within their jurisdiction to do so, it ought never to do so except upon an urgent requirement for the administration of justice, which we do not think this case presents."

In the case before us so long as the judgment remained suspended and had not become final by reason of pertinent rules of law applicable thereto, we think the judge might have relaxed the rule and considered the plaintiff's motion had he seen fit to do so. In other words, we think that the enforcement or nonenforcement of that rule lay within his sound discretion, assuming that he otherwise still had jurisdiction of the matter.

▓▓▓ However, as appears from what we have hereinabove said with respect to the proceedings, the order entered nunc pro tunc

July 9, 1940, shows that the Court struck the plaintiff's motion on the ground "that no good cause has been shown why the rules of the Court should be set aside," as well as on the ground that the Court would not have allowed the motion to have been submitted "had his attention been called to the fact that the fifteen day period had expired."

It is also shown by the order overruling the plaintiff's petition hereinabove referred to that the judge refused to entertain the petition not only upon the ground that he conceived he had no jurisdiction to do so but also "because the Court had already granted defendant's motion to strike plaintiff's motion for a new trial."

In these views we think he was on solid ground and that it was well within his discretion to so hold.

Plaintiff's principal contention is that since it was made for his convenience the judge "had a right to waive the fifteen day rule if he wanted to" and that he did this irrevocably when, after the fifteen day period had expired, he entered an order on his minutes reciting that the motion had been submitted to the Court.

As already indicated we agree that he had full discretionary power to waive that rule, but we are unable to agree that the order referred to amounted to an irrevocable waiver, especially in view of the fact that the subsequent order particularly recited that the attention of the Court had not been directed to the fact that the fifteen-day period had expired. In short, we think it was within the discretionary power of the judge to enforce that rule at any time he conceived the ends of justice to require it, so long as he had jurisdiction of the matter.

The result is that the judgment in this case is affirmed at the cost of the plaintiff.